Gorss Motels, Inc. v. Safemark Systems, LP Gorss Motels, Inc. v. E&G, Inc. v. Gorss Motels, Inc. v. E&G, Inc. Thank you, Your Honor. May it please the Court. My name is Glenn Herra. My colleague Jeffrey Berman and I represent the appellants Gorss Motels, Inc. and E&G, Inc. This case involves two consolidated appeals. The first from the District Court's denial of class certification in this case and the second from the District Court's entry of summary judgment for the defendant, Safemark. Both decisions are based on the same legal errors. The first being, primary one being, that the District Court imposed the burden of proving a lack of prior express invitation or permission on the plaintiffs. That is the defendant's burden, to prove that it obtained the fax recipient's prior express invitation or permission. The second was that a fax sender can't obtain prior express invitation or permission simply where the recipient voluntarily provides a fax number and where there's a business relationship. Is there, though, something more here than simply providing a fax number? Doesn't the record reflect that your client provided the fax number in conjunction with signing the franchise agreement? So the two are sort of linked up, the provision of the fax number and the agreement in the franchise, the consent in the franchise agreement to receive optional assistance in purchasing or whatever. Right. There's the clause of the franchise agreement is, we may, Wyndham is we, we may offer optional assistance to you with purchasing items used at or in the facility. Our affiliates may offer this service on our behalf. So you're agreeing that they may make an offer of that service on their behalf to you. That's something that your client has agreed to, that they have the right to do. Correct. And what's the disservice? You need to make another inference, though. You need another skip, at least two. One is that these offers of assistance will be made by facsimile. This provision says nothing about facsimile is being sent to the plaintiff's fax number. And the second will be that there'll be advertisements on behalf of Safemark. This clause says nothing about Safemark or ads for... It says on our behalf. Right. Correct. And it says our affiliates, right? Our affiliates can do this on our behalf. The Safemark piece of it doesn't seem that difficult to me. Safemark is an affiliate. I agree. Right. But still, even if you will treat that inference, you still need to, to imply that it's okay to send fax advertisements. So why is that exactly? I mean, so I'm looking at the language of the statute. Unsolicited advertisement means any advertising material, the commercial availability or quality of any property, goods, service without prior express invitation permission. Where is the requirement in there that it be received by fax? It just says that you're agreeing to receive material advertising with commercial availability or quality of any property. Right. But prior express invitation or permission to receive an unsolicited advertisement by telephone facsimile machine must specify that the ad will be received by fax. That is not in the statute. That is in the FCC's interpretations of the statute in both the 1995 order and the 2003 order, which we discuss in our briefs. It's also in the 2006 order where the FCC holds that it is the sender's burden approving prior express invitation or permission. So I get it. I mean, I guess I get it that this statute is sort of about telephonic and facsimile communications, but I just don't see in the definition of unsolicited advertisement that you have to have expressly consented or permitted to receive faxes. It's in the FCC's interpretations, and those interpretations are binding in district courts. That's what this court held in Mayes v. Gulf Coast Collection, the Murphy case, which we discuss in our briefs as well. District court is not free to disregard those interpretations. It must apply them even if it disagrees with them. What about the fact that you signed this franchise agreement that we've just read the language aloud and you provided a fax number? Why don't we make that link that you understood you were going to receive, that you might receive things by fax? That would be at least one form of permissible communication. I understand completely that is not necessarily an unreasonable inference, but it is still an inference. It is not expressly stated. Now, what it does get you, though, this is exactly what Congress contemplated in 2005 when it passed the Junk Fax Prevention Act of 2005. There's a safe harbor, there's an exception for sending unsolicited advertisements by fax, in section 227B1C, and then there's little Roman numerals 1, 2, and 3. Congress provided there that if there is an established business relationship between the fax sender and the fax recipient, which is very easy to create. An EBR is created by any voluntary two-way communication between two businesses. So if there's an EBR between the sender and the recipient, the sender obtains the recipient's fax number in a permissible way, including the voluntary communication of the number from the recipient to the sender. And three, the sender includes an opt-out notice on the fax that complies with the statutory requirements and the FCC's implementing regulations. So does the 2013, then, meet the EBR safe harbor? The 13 is the one with the opt-out language, right? The 2013 fax, as there were two about a few days apart, they have no opt-out. Okay, so the 15, then. I'm sorry, the 15. Does that meet the EBR? It seems to me that one formally came from Wyndham, correct? Or Wyndham sent it through a third party or some such. So Wyndham and your client certainly have an existing business relationship, right? Absolutely, yes. And there was the provision of the fax numbers for some directory or something, right? Correct. And there was opt-out language. The opt-out notice is not even close to complying with the statute. So that's where the argument hangs on the 15 notice. Exactly, yes. Opt-out notice is there but insufficient. Right, there's no fax number in the notice to use for sending a request. It does not advise that an opt-out request must be honored within 30 days. In other words, the recipient doesn't know that they can demand an opt-out as opposed to just requesting one. Would you please take me off the list? It's a legally enforceable demand. It does not advise the recipient of what the requirements for a compliant opt-out request are. The statute and the regulation impose requirements on the recipient in making the opt-out request. For example, if you don't specify the fax number that you want removed from the list, it's not an enforceable opt-out request. If you just give your name and address, for example, and say, I'm Gorse Motels, please take me off your list, not enforceable. If they send follow-on fax advertisements, they can still invoke the statutory safe harbor. And it's also not clear and conspicuous. There's another separate statutory and regulatory requirement. It's in fine print. It's in the smallest type at the bottom of the page. No reasonable consumer would notice it. It certainly wouldn't be conspicuous to a reasonable consumer. So your argument, though, is that this is an unsolicited fax, and presumably your opponent would argue that it was a solicited fax. That's correct. I'm arguing it's an unsolicited fax that falls perfectly within the parameters of what Congress was trying to do in the junk fax prevention act. If we say it's solicited, how do you address that issue, especially with the question that has been posed to you by the court about whether or not with the D.C. Circuit opinion and whether the opt-out notice is going to be required for solicited faxes? Right. If the court affirms, the district court's finding, that these plaintiffs gave prior express invitation or permission, which obviously we argued they didn't, then I have to rely on the FCC's 2006 regulation requiring opt-out notice on faxes sent with prior express permission, which was at issue in the Bayes-Yakoff litigation, the FCC's 2014 order, and the most recent Bureau, the Consumer and Governmental Affairs Bureau order of November 14th, 2018, which purported to eliminate the regulation from the regulations. I have to point out something with the court's notice on that issue. The November 14th, 2018 order is not an order of the FCC. It is an order by the chair. Is he called the chair of the Consumer and Governmental? It's the chief of the Consumer and Governmental Affairs Bureau, right? Correct. My clients, along with a number of other plaintiffs. That's the way it's done, isn't it? It's published in the Federal Register. It's no longer part of the CFR, right? I disagree completely. It is how it's usually done. There's usually a Bureau-level order that's taken on delegated authority, and then any party, any agreed party, can file an application for review from that Bureau-level order with the full FCC, meaning the five commissioners who are appointed by the president with the advice and consent of the Senate. My clients in this case have done that, along with a group of other plaintiffs. We have filed an application for review with the full FCC, arguing that the Bureau's order is erroneous, and it's erroneous because it says, in light of the D.C. Circuit's decision that the FCC lacks authority to regulate facts assent with prior special permission, we are required, it's mandated that we get rid of this rule, and so that's the basis upon which we're going to do it. Not that it's a bad policy or that they actually do lack statutory authority, just that the D.C. Circuit has commanded us to do this, essentially. That's wrong. The D.C. Circuit didn't command the FCC to do anything, and the FCC does not have to acquiesce in the D.C. Circuit's determination. I think this FCC probably will acquiesce in that determination, given Chairman Pai's and Commissioner O'Reilly's views on the topic, because they dissented from the 2014 order when there was a Democratic majority. What if they did? Then I will appeal that decision to a Circuit Court of Appeals in which venue is proper under the Hobbs Act, 28 U.S.C. 2343. That could be in the D.C. Circuit Court of Appeals or in the Circuit Court for any jurisdiction where one of my clients, one of my petitioners, resides or has its principal place of business. So I might take it to the Second Circuit. I might take it to this circuit. I might take it to, I don't know. I'm not sure. I haven't really done the calculus on where I'm going to file, but there could be multiple petitions filed if there were in Beas Yaakov, and then there's a procedure for consolidating those into one circuit, as happened in the Beas Yaakov case. But it's not over. Can I just get one clarification? I just want to make sure, because this was a little unclear to me from the district court's opinion, but you don't disagree, do you, that each of the two clients here did provide their fax number to Windham in conjunction with the signing of the franchise agreement? Yes, I agree with that. Okay. I just wanted to make sure. That's helpful to me. The district court's opinion seemed to me to suggest that one of them did and that one of them sort of provided it at any old time earlier in the process. But it sounds like they both provided it in conjunction with the signing of the franchise agreement. They both put their fax numbers in there. Okay. Perfect. Thank you. Saved my time for rebuttal. Thank you. Mr. Frank Gore. Good morning. My name is Joseph Frank Gore. I'm here on behalf of Safemark. May it please the court. There's a lot for me to talk about. I think I'd like to start with the court's question about mootness. I thought the authorities cited by the 11th Circuit in that notice were directly on point. Flanagan's Enterprises. If the statute is no longer in play, how could there be a violation? The cases in the 11th Circuit are very clear. There is an analysis that's done to make sure that it's not a temporary withdrawal, that maybe the city or the statute, you know, they're not going to reinstate it at a later time. Your opponent says they might, that there's been a petition for review filed and that they might. I find that very interesting because the D.C. Circuit said that, you know, based on separation of powers, the FCC was way out of bounds in what it did, and it did not have the authority, nor was it granted the authority by Congress. And then in the FCC's order of November of 2018, this reads like a mea culpa. Is he right, though, that a petition for review means that it might be, at least theoretically, reinstated? I don't see how that's possible when the FCC itself called its own rule unlawful. How could it reinstate a law that it's acknowledged was unlawful? I understand it. What his argument was a moment ago was that it's one thing to say that there was a problem with the rule, but it's another thing to say that the solution is to repeal it. And his argument is that the D.C. Circuit, that the commission was wrong, or the chief of the Bureau, I guess, was wrong to interpret that D.C. Circuit decision as requiring the removal of the regulation, and that there's going to be litigation about that, and so it could at least theoretically be reinstated. It's not moved yet. Well, I have no doubt that my friend is going to make those appeals. I don't see any basis for that. The way Bias Yakov came to be, there were several petitions filed. There was a multi-district litigation consolidation. The whole point of an MDL consolidation is to avoid this, is to have, let's not do it 10 different places. Let's not have inconsistent results and the waste of the economy. Let's consolidate it, and we all agree, whatever that court says, we're all going to follow it. And that's what happened in Bias Yakov. That was consolidated MDL. There's plenty of authorities in the papers that say, when that happens, that should be the end of it. It sounds like now we're talking about two slightly different things. One is, are we bound by Bias Yakov? That's the argument you're currently making. Two is, does the FCC, or the chief of the Bureau's purported withdrawal of the rule move the case, and your adversary says, not necessarily, like maybe predictively, we might assume that the FCC is going to concur in that judgment, but it hasn't happened yet. So as to the latter piece, what about that? I still don't think there's any evidence to show that this rule can come back. As a matter of fact, at the time this order, November 2018 FCC order came down, there was 10 petitions to be excused from the solicited facts rule. Safe mark, my client was one of them, based on this very litigation. The order speaks to my application. It says, in the footnote, for C petition of safe mark systems for retroactive waiver. And in the discussion, the FCC says, we also dismiss as moot the 10 pending petitions for retroactive waiver. Then there's an order at the end, and I disagree with counsel completely. So first they repeal the statute, and then the second part in paragulation, not a statute. I'm sorry? It's a regulation. A regulation. Not a statute. That's right, Your Honor. Just trying to be clear. So they withdraw the regulation first. Then they address, it is further ordered that the application for retroactive waiver filed by safe mark and others are dismissed as moot. So we have an application that there was over 100 granted, 100 applications were granted by the FCC because the solicited facts rule was really doomed from the start. Everybody knew it was very unclear and hard to follow. So the FCC granted 100 waivers, and there were still 10 pending at the time that this order was issued. And it was dismissed as moot. Well, why would they dismiss it as moot if they were going to bring it right back? It just doesn't make any sense. This order shows exactly, unambiguously, that the solicited facts rule is not coming back unless it comes back from Congress. It's certainly not coming back from the FCC. So then that brings us, I guess, back to the question where your adversary began, which is the statute itself. Why is it that this is not an unsolicited fax? It strikes me that under the language of the statute, at least the paradigm case of a solicited fax would be, you may send me, or please do send me, material advertising the commercial availability or quality of any property, good or service. How do we get from that paradigm case to this case? Well, that never really happens, right? In a business relationship, if we're doing business with one another and you give me your contact details and I give you and then I contact you that way, you haven't really asked for me to contact you, but you've given me, we've set up a mode of communication that is agreed to between the parties. I'm just trying to square it with the language of the statute, which says express invitation or permission, which must mean something. I looked it up, express, definitely stated, not merely implied. So I guess I'm not fully satisfied with the answer, well, that's just sort of not how it works in the real world. Everybody kind of winks and nods and knows that when you provide a fax number, you're effectively concurring. No, I understand, and I have the record is packed with it, and I have a few highlights here that I'd like to go over, which will answer your question. Yeah, great. So the first thing is what did the FCC say with regard to the TCPA? Judge Presnell in his class cert decision actually quotes this and says, quote, persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which has been given absent instructions to the contrary. So that comes from Judge Presnell quoting the FCC with regard to the TCPA. So if you provide your fax number, that's consent. The best answers to you on the record have to come from these four Wyndham declarations. They were really, really helpful, and Judge Presnell relied on them to a great extent. The first one is the declaration of Andrew Cattuso. He's the Vice President of Marketing Communications and Technical Solutions at WSSI, which is Worldwide Solutions. He describes in detail the approved supplier program and how the franchisees, we're talking about franchisees. These hotels aren't free to decorate however they want. But just so I'm clear, because I don't want you to sort of spend all of your time sort of marching through declarations, is the gist of it, nobody said, as we've discussed earlier, I'm sure there's no witness who testified, somebody at the hotels told us that we could send them faxes, right? So we're not relying on that kind of express statement. Instead, we've got to kind of piece it together from other evidence. And the principal piece of documentary evidence, I assume, is this provision in the franchise agreement, 4.4? There's three sources of information. Okay. The franchise agreements, 4.4. Right. In connection, too, with the notice in the franchise agreement that includes fax number, right? That's right, Your Honor. That's number one. That's number one. And before we move beyond number one, just so I'm clear, 4.4, we may offer optional assistance to you with purchasing items used at or in the facility, and our affiliates can do it for us, right? Correct. I'm willing to sort of ignore the affiliates can do it for us. I'm interested in whether optional assistance with purchasing is express permission to receive advertisements. Because the last sentence also says, we'll maintain and provide to you lists of suppliers approved to furnish mark-bearing items. Not we'll provide your information to them, but we'll provide their information to you. So it sounds like the arrow is running in the other direction to me. Well, if you look at the declaration of Tracy Rippa from Wyndham Hotel Group, she testified that the approved supplier program was designed to benefit the franchisees by identifying vendors such as Safemark, who are expected to provide competitive pricing on products that conform to the applicable standards. This whole approved vendor program. The whole point of the list, in other words, is so that the franchisee knows, oh, this is someone who can send us that information. Is that right? That's right, Your Honor. And there are standards. If you want to be part of Wyndham, okay, you have to meet our standards. You can't paint whatever you want, and you can't have low-quality carpeting and everything else, including safes. You have to meet their standards, and it's in the Wyndham affidavits. These are all on the record on the docket, 70, 70-4, 6, 7, and 8. These four Wyndham affidavits, it's all here. Is there any evidence in the record that a franchisee could opt out of providing a fax number? Oh, yeah. Yeah, they do not. Yes, and Wyndham testified that, and that's in the record, and it's one of these four affidavits, that neither Gorse nor E&G ever opted out. They never told Wyndham, we don't want to be contacted by fax. So you would view it that this is a solicited fax by virtue of the fact that they signed the franchise agreement and provided the fax number, that if they didn't want to receive faxes, don't give us your fax number. Correct, and it's not just the franchise agreements. There was contact forms. These relationships went over decades. There were contact forms. How would you like to be contacted? Gorse provided two of them with their fax number. So did E&G. And then Wyndham has this annual global conference. Let's step back about that. Yep. That contact form, what is that? How does that arise? What does it say? So Suzanne Fenimore, in her declaration, she's the Senior Director of Contracts Compliance for Wyndham Hotel Group. She testified that Gorse provided their fax numbers in the following ways. Through the franchise agreement, Gorse also provided its contact information, including the fax number, several times during the party's relationship, including contact forms of January 20, 2010, and 11-24, 2015, which both provided their fax numbers. And then Gorse entered into a— What is that form? What does it say? To whom is it being given? What do we have about that? That's from the franchisee, Gorse, to Wyndham. It's not directly to Safeway. What does it say? What does the form say? It's just a contact form. I think it doesn't say anything except, please provide your contact details. When were the dates that these forms were exchanged between Gorse and Wyndham, the contact forms? January 20, 2010, which was before any of the faxes in question, and then again November 24, 2015. And where just—so I have it straight in my head. Where is that in relationship to the signing of the franchise agreement? So Gorse had two franchise agreements. I believe the first one might have been 1998 or 1997, and then again they signed a second one in 2014. E&G was a little bit easier. They were in 1997, and that was a 20-year agreement. So would your position be the same, that this was express permission or invitation, if there was a franchise agreement signed with 4.4 in it, but no fax number provided in conjunction with the signing of that franchise agreement, and like some other old time, 20 years before, five years hence, there was a fax number provided? Or do the two in your mind need to be fused so that the 4.4 and the fax number are kind of coming together, and thereby you can—I was going to say imply express agreement, but that sounds ridiculous. You can find express agreement. Judge Newsom, I think if a franchisee, at least according to Wyndham, wanted to be contacted in a mode other than fax, that would have been okay. Safemark testified they didn't even want to send the faxes. They had to send the faxes because of the program. That's how Wyndham wanted to do it. I don't believe any of the franchisees were obligated to accept a fax. That's how it was set up, unless you wanted to opt out and be contacted some other way. But I guess the reason I'm asking is that the contact form, just sort of a blank contact form in the ether without connection to the franchise agreement, saying, oh, I can be contacted by fax, that doesn't necessarily, does it, to receive advertisements, which is what this— Oh, I see what you're saying. I think the contact form is not as great of evidence of intent that the franchise agreement was. And then the third thing I was going to say was also participation at the global conferences. These global conferences were really nothing more than come meet the vendors, come meet the products and services that we offer. Hey, guys, make sure you're all in compliance with Wyndham's standards. How would you like to be contacted by these vendors? Because that's the whole point. And both—who was it? So it was the declaration of Christine Stoop. She was the senior manager of event planning for Wyndham. This is at docket number 70-8. She said that Gorse provided his fax number at the April 2012 global conference, at the April 2015 global conference. So E&G provided its fax number at the April 2015 conference, and Safemark was an attendee of all of those conferences. If we say that this is an unsolicited fax, do you lose? Yes. Yes, because there's no doubt, there's no issue here that the faxes that were sent did not have the statutory required opt-out language. That's not my position. Thank you. Thank you. My friend stated that it never really happens in the real world that somebody calls up the business and says, can I send you a fax ad, or the other way around. The recipient calls the sender and says, why don't you send me information by fax. That's not quite right. It does happen sometimes, and a sender can call. But there is a certain truth to it, because. To me it's irrelevant. Yeah. The question is, did they? Right. Did they give you, did your client give permission to be contacted by fax in this manner? That's the real question, right? Not to send fax ad. Not could it have been done better, but was it good enough? Right. But I do think it's relevant that it does show exactly what Congress was thinking in 2005, because they realized that businesses have each other's fax numbers, and they wanted to facilitate interstate commerce and allow businesses that have relationships to fax each other without getting express permission. But at the same time, they were very concerned. Do you think to me that when you sign a franchise agreement, and you agree that you may be, that these suppliers may be offering things to you, and then you provide a fax number, you're telling them communicate with me by fax? I could see how you could infer that, but that's not express. That's not an express permission. In writing, I mean, it's part of a written agreement. That's all express means, isn't it? It's not implied in the sense that, you know, somebody winked or nod. It's written in an agreement. No, express has nothing to do with written or not written. Express means clearly and unmistakably stated. It can be oral. It can be written. But that's not the distinction between writing and oral or written. I mean, I actually think that is like the really interesting meta question in this case, is what does express mean? Does express mean express in the sense of definitely there on the front end, there is definitely an agreement, which there is here, right? Undoubtedly, there is an agreement. It happens to have been in writing, but it's there for all to see in black and white. And then separately, does express apply within the four corners of those agreement to require clarity or certainty? That's where I get hung up. I'm not sure that this 4.4 is express permission or invitation within the four corners of it. I don't doubt for a minute that your client signed a written agreement expressly agreeing to something. I just can't quite tell what you expressly agreed to. That means it's not express permission per se for Mark to sign FACTS Act. So your position is that express applies both on the front end to show that there is an agreement and within the agreement to show what the agreement is. Yes, and I think that is consistent with the FCC's interpretations in the 1995 order, the 2003 order, and the 2006 order. They say it needs to be permission. The consumer needs to understand that they will be receiving advertisements by facsimile, not something else by facsimile, non-advertisements by facsimile, and not advertisements by some other means like mail or, you know, telegram. I don't know. It specifically governs the use of telephone facsimile machines because that was such a problem that Congress prohibited it in 1990. Will you help me just so I can write the citation down? What's the—I know it's in your briefs, but the regulations that you're relying on that get you from the statutory text to FACTSs specifically? You said something like the FCC said this in the late 90s and then again in 2004 or something? Right. Because on the face of the statute, it doesn't seem to me that it requires express consent or permission to FACTSs. It just requires express permission or invitation to advertisements. I get it that the statute is about FACTSs sort of. So the 1995 FCC order is at 10 FCC record 12391. We cite it in our brief in the appeal from the summary judgment at 20. Okay. And then the other one? And the 2003 order is on the same page, 18 FCC RCD 14014. Got it. Thank you. So the 1995 order is the TCPA does not equate mere distribution or publication of a telephone facsimile number with prior permission or invitation to receive advertising. Let me ask you this question. If the franchise agreement, instead of being worded the way it was, it said we may advertise to you items used at or in the facility, our affiliates may advertise those items on our behalf. No, it has to tell them we're going to FACTS these to you. Well, set aside the FCC piece for a second. His question on the statutory language. What if it did say advertise? I'm interested in the answer to his question on the statutory language. And an agreement where you have also supplied your FACTS number under the notices. That gets you two of the three elements of the EBR safe harbor. No, no, no, on unsolicited FACTS. That's not prior express invitation. Why not? No. Why not? So I've given you my FACTS number. And then you've signed an agreement. You've agreed that you can receive advertisements from them. No. That says nothing about FACTSs. I don't know that you're going to send advertisements to my telephone facsimile machine using up my paper and toner and ink. You might be sending them to me by mail. Email. Go ahead. What if you listed both? Telephone number, address, and FACTS number. Then you agreed that our affiliates may advertise to you. And one might reasonably infer that it would be okay to send FACTSs, advertisements by FACTS, but it's not an express permission or invitation. It's an implication. It's an inference. Just so I'm clear, I just want to make sure where all of the requirements are coming from, though, because I think that Judge Pryor's question, if 4.4 says we may advertise to you items to be used in your facility, that meets, in my mind, would meet the statutory language. It may not get you to what you're telling me the FCC has said, which is to require some prophylactic on top of the statutory language. You've got to agree to FACTS advertising, not just advertising. With all due respect, the statute means what the FCC says it means. Yeah, I get that. I get that. But just so I'm clear, on the face of the statute, there's not a requirement that you agree to receive FACTS advertising, just that you agree to receive advertising. I disagree because the FCC has interpreted it to mean that. I know, but now we're just playing word games. I'm just saying on the face of the statute, that's what the statute says. I understand that your permission is that the FCC has definitively, you would say, interpreted it to require prior express permission to FACTS advertising. But so all I'm asking you is I need to go look at the FCC's interpretations, correct? That is true. Get myself to FACTS advertising. Yes, I mean, they've interpreted the statute that way, yes. Thank you, Your Honors. Huebner versus Bradshaw.